Arnetta YORK, Alma D. Willis, Herbert White, Gwendolyn Webb, Helen Taylor, Barbara J. Taylor, Valeria B. Oakley, Charlie Nichols, Portia M. Lockette, Robert Likely, Ernestine Kinslow, Angela King, Paula A. Hickman, Angela M. Gordon, Salle Ann Glover, Deborah A. Flakes, Cloteal Feurtado, Palmer Deloris Curry, Augusta F. Crosby, Alfreda Bolden, Joyce R. Black, Brigitte Bartell and Ricky L. Allen, individually and on behalf of a class of similarly situated persons, Plaintiffs,

v.

ALABAMA STATE BOARD OF EDUCATION; John Tyson, Isabelle Thomasson, S.A. Cherry, John Fulmer, Victor Poole, Harold C. Martin, James B. Allen, Jr., and Evelyn Pratt, individually and in their official capacities as members of the Alabama State Board of Education; Wayne Teague, individually and in his capacity a State Superintendent of Education; Board of School Commissioners of Mobile County, Alabama; Abe L. Hammons, Dan C. Alexander, Jr., Norman J. Berger, and Ruth F. Drago, Defendants.

Civ. A. No. 83–T–421–N.

United States District Court, M.D. Alabama, N.D.

Aug. 10, 1983.

James U. Blacksher, Gregory B. Stein, Blacksher, Menefee & Stein, Mobile, Ala., Donald Watkins, Watkins, Carter & Knight, Montgomery, Ala., for plaintiffs.

Jon A. Green and Robert Campbell, Sintz, Pike, Campbell & Duke, Mobile, Ala., and Robert E. Sasser and J. Fairley McDonald, III, Jones, Murray, Stewart & Yarbrough, Montgomery, Ala., for defendants Bd. of School Com'rs of Mobile County.

T.W. Thagard, Jr., and David R. Boyd, Charles S. Coody, Montgomery, Ala., for state defendants.

## OPINION

MYRON H. THOMPSON, District Judge.

Suing on behalf of themselves and others similarly situated, the plaintiffs—19 black and three white former, nontenured teachers in the school system of Mobile County, Alabama—brought this cause of action on May 4, 1983, challenging the school system's use of the National Teacher Examinations (NTE) to determine whether teacher applicants should be employed and nontenured teachers reemployed. The plaintiffs contend that the use of the tests has had a racially disparate impact on black nontenured teachers in the school system, in violation of Title VII of the Civil Rights Act of 1964, codified as 42 U.S.C.A. §§ 2000e through 2000e–17.[1]

The plaintiffs are teachers who were employed in the Mobile County School System for periods ranging from one to three years, whose principals gave them satisfactory performance evaluations and recommended their reemployment, and who were denied reemployment solely because they were unable to make a certain score on a part of the NTE.[2] The defendants are the Alabama State Superintendent of Education, the Alabama State Board of Education and its members, the Mobile County Super-

---

1. More specifically, 42 U.S.C.A. § 2000e–2(h) provides in part:

   Notwithstanding any other provision of this [title], it shall not be an unlawful employment practice for an employer ... to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.

   This court's jurisdiction has been properly invoked pursuant to 42 U.S.C.A. § 2000e–5(f). Also, the named plaintiffs appear to have met all precedent requirements such as filing timely charges with the Equal Employment Opportunity Commission and receiving right-to-sue notices from the commission.

2. By order entered contemporaneously with this opinion the court has also provisionally certi-

   fied the plaintiffs as consisting of the following class: applicants for teaching positions and nontenured teachers who have been in the past, or may be in the future, denied employment or reemployment in the Mobile County School System because of the school system's NTE test requirement. Within this class, the plaintiffs have also been certified as consisting of the following subclasses: (1) black applicants for teaching positions and black nontenured teachers who have been in the past, or may be in the future, denied employment or reemployment in the school system because of its NTE test requirement and (2) white applicants for teaching positions and white nontenured teachers who have been in the past, or may be in the future, denied employment or reemployment in the school system because of its NTE test requirement.

intendent of Education and the Board of School Commissioners of Mobile County and its members.[3]

This cause is now before the court on the plaintiffs' May 31, 1983, application for preliminary injunctive relief (1) prohibiting the Mobile County defendants from using the test requirement and (2) requiring that said defendants reemploy nontenured teachers, such as the plaintiffs, who but for their failure to meet the test requirement would have been reemployed.

Based upon the evidence adduced at a July 13, 1983, hearing,[4] and the briefs and other submissions of the parties, the court for reasons which follow concludes that the application for preliminary injunctive relief is due to be granted.[5]

## I. THE FACTS

The NTE are a battery of tests designed, in general, to measure the academic preparation of persons who plan to enter the teaching profession. The tests were devised and are published and administered by the Educational Testing Service of Princeton, N.J. ("Testing Service" or "Service").

As early as 1978, the administrative staff of the Board of School Commissioners of Mobile County began inquiring about the use of a written test for teachers and prospective teachers in the school system. At this time the NTE consisted of a "common examination," administered to all applicants and designed to measure a teacher's general educational background, and an "area examination," designed to measure a teacher's knowledge of the specific area in which he or she had concentrated academically and intended to teach. In line with this, the Testing Service in its guidelines cautioned would-be-users that the NTE were designed to assess academic prepara-

tion only and that they should be used only when there is no record of a teacher's actual performance. The guidelines provided:

INAPPROPRIATE USES OF THE NTE

Using the NTE with inservice teachers for determining a teacher's retention, or tenure, status is not a use that was intended for the tests.

The NTE measure academic preparation for teaching, not the act of teaching itself; and the critical criterion in evaluating an inservice teacher is not potential but actual teaching performance. If an adequate and reliable record of a teacher's inservice performance is available, that record should be used.

The guidelines further cautioned that arbitrary cutoff scores on the NTE should not be used unless there is prior knowledge of the consequences of such use. The guidelines provided:

Using arbitrary cutoff scores on the NTE for any purpose is discouraged. It is unreasonable to choose a qualifying score on the basis of unvalidated criteria or because another school system has selected such a score as a passing level. It is essential to have prior knowledge of the tests and the scores and the consequences of establishing cutoff scores. School and college officials should become familiar with the tests and their characteristics.

The guidelines also discussed several federal court decisions in which the NTE were challenged as having a disparate impact on black teachers.

In a written response to the inquiry of the administrative staff of the Mobile County School System, an administrator of the Testing Service echoed these guideline concerns, stating that

---

**3.** The State of Alabama defendants take the position that if the Mobile County School System's test requirement has not been "validated," *see* note 11, *infra,* the tests should not be used. The plaintiffs contend that the state defendants are nevertheless liable because they failed to prevent the Mobile County defendants' use of the test requirement.

**4.** The defendants declined to present any evidence at the end of the plaintiffs' evidence at the July 13 hearing.

**5.** The plaintiffs have advanced alternative bases for relief which the court need not consider in view of the disposition of their Title VII claim.

the purpose for which your board plans to use the tests troubles me. As I told you over the telephone, tests of academic competence for teachers are a surrogate measure of that teacher's ability to teach and are useful when *little or no* information about a person's actual skill as a teacher is available. Thus, while such tests may be useful as part of a teacher selection program, they are typically not appropriately used to determine whether inservice teachers should be retained.

The Mobile County Board of School Commissioners appointed a committee to study the possibility of using written tests in the school system and to make a recommendation to the school board. The committee used three sources in conducting its study. The first source was the school system itself. The committee determined that for 290 teachers in the school system the mean score on the NTE common examination was 600, with a standard deviation of 93. This universe of 290 teachers was, however, not selected randomly. Instead, the files of the more than 3000 teachers then employed were examined and approximately 900 teachers were found to have gratuitously furnished the school system with their NTE scores. These 900 teachers were then contacted about using their scores for research purposes. 292 agreed to such use. Two of these 292 teachers, however, did not have common examination scores, leaving 290 as the committee's research universe.

The committee's second source was the Testing Service. The committee determined from the test literature provided by the Service that the national mean score on the NTE common examination was approximately 550, with a standard deviation of 70 or 80.[6] The third and final source was other school systems. The committee found that some of the other school systems used the NTE as a part of their initial selection process, but none required teachers already employed to take the NTE as a part of continued employment.

On the basis of its study the committee concluded that there should be an absolute hiring cutoff of 500 on the NTE common examination, and recommended this requirement to the Mobile County Board of School Commissioners. On June 13, 1979, the school board adopted the committee's recommendation and enacted the requirement that an NTE common examination score of 500 was necessary for employment of new applicants and reemployment of nontenured teachers.[7] However, in order to meet the school system's needs for the 1979–80 school year, the school board found it necessary to employ applicants who had not taken the NTE and to reemploy nontenured teachers who had scored below 500. These teachers were issued "conditional contracts," which conditioned their future employment on their taking and scoring 500 on the next available NTE.

At the end of the 1979–80 school year, all conditional contracts were nonrenewed. Those teachers who had in the meantime scored 500 and had been recommended for reemployment by their principals or other supervisors were issued regular contracts for the following school year. Conditional contract teachers who had not scored 500 were also reemployed if in their teaching areas teachers who had scored 500 or who had yet to take the NTE were unavailable. All other conditioned contract teachers who failed to score 500 were not reemployed. This practice continued generally through the 1980–81 and 1981–82 school years, by which time some of the reemployed conditional contract teachers were completing

6. The plaintiffs contend that the committee found that the mean score was 559, with a standard deviation of 91. There is no evidence in the record, however, to support this factual contention.

Instead, Deputy Superintendent J. Larry Newton testified in his deposition that the mean score was approximately 550, with a standard deviation of 70 or 80.

7. The evidence is unclear, but it appears that the 500 score requirement was waived for nontenured teachers entering their third year of employment in the 1979–80 school year, and may have been waived for those entering their second year of employment in 1979–80.

their third year and, if rehired for a fourth year, would acquire tenure.[8] Faced with this prospect, the school board again nonrenewed all conditional contract teachers, but with the following added restrictions: First, no conditional contract teachers who failed to score 500 could be reemployed if by doing so they would acquire tenure; and, second, no conditional contract teachers scoring below 500 could be reemployed unless their score was 468 on the common examination and unless in their teaching areas teachers who had scored 500 or who had yet to take the NTE were unavailable.

In 1982, the Testing Service changed the NTE format. Instead of the common and area examinations, the NTE now have a "core examination" and a "specialty examination." In response, the Mobile County Board of School Commissioners adopted the following policy:

### NTE REQUIREMENTS FOR APPLICANTS FOR 1983–84

NTE requirements for employment in the Mobile County Public School System shall be as follows:

*Regular Contract*

1. A score of 500 or above on the Common Examinations; or

2. A score at or above the 25th percentile on the Area Examinations; or

3. A score at or above the 25th percentile on the Specialty Area Tests; or

4. A composite score at the 25th percentile on the Common and Area Examinations; or

5. A score at or above the 25th percentile on each area of the Core Battery.

*Interim Contract*

Interim contracts may be issued if necessary, under the following conditions:

6. New teachers may be employed, as necessary, who have not taken the NTE.

7. New applicants may be employed with a score between 467 and 500 on the Commons or a score at or above the 20th percentile of the Specialty Area or Core Battery tests on a one-year basis when no other qualified applicants are available.

As to the use of percentile ranks, the NTE guidelines provided:

Percentile ranks should not be used as cutoff scores. NTE percentile ranks result from current test norms based on actual NTE examinees from the past two testing years. They are provided as an aid to candidates and others in understanding the meaning of NTE scores and to enable comparisons of scores earned by candidates who have taken the same tests. Comparisons of an individual's scores with scores earned by other candidates are useful only when the comparison group is an appropriate one. Program data yield information about a person's standing among people who elected to take the same examination during a specified time period. In some instances it is probably more appropriate to compare an individual with others in more specific groups—for example, those who have been through the same training program or who are applying for teacher certification under the same jurisdiction. An individual's rank in such groups may be quite different from his or her standing in the groups presented in an NTE score interpretation document.

The published NTE percentile ranks are frequently referred to as "norms." The norm in this sense is an interpretation of the distribution of a specific set of scores and at no time should be seen as an authoritative standard for all teachers in

---

**8.** The Mobile County School System, generally, has two types of teachers: nontenured and tenured teachers. Teachers are considered nontenured during their first three years of employment, and, in broad terms, they are not entitled to reemployment for any subsequent year as long as they receive notices of nonrenewal before the end of their present teaching year. However, if reemployed for a fourth year, teachers are considered tenured and, as such, are entitled to continuous yearly reemployment, unless terminated, after a hearing, for reasons set out by law.

the nation or in any particular community.

For the school years 1979–82, the teacher population of the Mobile County School System has ranged from 3100 to 3350, with a black population of 36–39% and a white population of 61–64%. For the same period 77 nontenured teachers, including the plaintiffs, were not reemployed solely because they failed to meet the test requirement. 51 (66–67%) of these teachers were black, and 26 (33–34%) were white. The parties agree that these are the only relevant data on the plaintiffs' claim that they have been able to compile since the filing of this lawsuit. According to them, other possibly relevant data—such as the total number of the school system's black teachers and the total number of its white teachers taking the NTE examination at any given time— would take several weeks, if not months, to compile and prepare for submission to the court.

Other evidence at the July 13 hearing included the testimony of Dr. C.C. Baker, Assistant Superintendent of Education for the State of Alabama. Dr. Baker, who participated in the development and implementation of the Alabama Initial Teacher Certification Test, testified that the NTE common examination is "a test developed nationwide [which] does not speak to the job requirements of the State of Alabama." He also stated that to professionals in the field of education the NTE are known as having an adverse racial impact on black teachers.

■ Furthermore, this court takes judicial notice that other courts have found in varying contexts that the NTE adversely affect black teachers. *E.g. United States v. State of North Carolina,* No. 4476, slip op. at 7 (E.D.N.C. June 23, 1982);[9] *Caulfield v. Board of Education of City of New York,* 486 F.Supp. 862, 898–900 (E.D.N.Y.1979), *aff'd* 632 F.2d 999 (2d Cir.1980),

*cert, denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981); *United States v. State of South Carolina,* 445 F.Supp. 1094, 1112 (D.S.C.1977); *United States v. State of North Carolina,* 400 F.Supp. 343, 347–49 (E.D.N.C.1975), *withdrawn on other grounds,* 425 F.Supp. 789 (E.D.N.C. 1977); *Pickens v. Okolona Municipal Separate School Dist.,* 380 F.Supp. 1036, 1039 & n. 5 (N.D.Miss.1974), *aff'd,* 527 F.2d 358 (5th Cir.1976); *Morgan v. Hennigan,* 379 F.Supp. 410, 464 (D.Mass.1974), *aff'd,* 509 F.2d 580 (1st Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).[10]

## II.  THE LAW

In order for a preliminary injunction to issue, a district court must be satisfied that a plaintiff has clearly met all of the following four prerequisites: (1) that there is a substantial likelihood of success on the merits, (2) that without the relief there will be irreparable injury, (3) that the threatened injury to the plaintiff outweighs any threatened harm to the defendant, and (4) that the public interest will not be disserved by granting the injunctive relief. *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.,* 697 F.2d 1352, 1354–55 (11th Cir.1983); *Dallas Cowboys Cheerleaders v. Scoreboard Posters, Inc.,* 600 F.2d 1184 (5th Cir.1979). Each of these prerequisites is now considered by the court.

### 1.  Substantial Likelihood of Success on the Merits

■ In a Title VII disparate impact case, such as the instant one, a plaintiff challenges "practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The plaintiff, therefore, need not prove intentional discrimination. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

9. A copy of the slip opinion is contained in the record of the instant case.

10. At least one court has found that although the NTE had adverse racial impact the examinations were legal because they were properly validated in the context in which they were used. *E.g., United States v. State of South Carolina,* 445 F.Supp. 1094, 1112 (D.S.C.1977), *aff'd,* 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978).

The proper allocation of burdens is well established. The plaintiff has the initial burden of establishing a prima facie case of racial discrimination, which he or she may do merely by showing that the facially neutral tests in question have an adverse racial impact. *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854. Tests are considered as having an adverse racial impact if they "select applicants for hire or promotion at a racial pattern significantly different from the pool of applicants," *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show that the tests have "a manifest relationship to the employment in question," *Griggs, supra*—that is, have been validated.[11] If the defendant carries its burden, the plaintiff may nevertheless prevail if he or she can show "that other selection devices without a similarly undesirable racial effect would also serve the employer's legitimate interest." *Albemarle Paper Co., supra.*

The plaintiffs contend that the following evidence sustains their initial burden of establishing a prima facie case of adverse impact, to the extent required on a request for preliminary injunctive relief. First, they note that while the school system is only 36–39% black, 66–67% of those not reemployed because of the test requirement were black. Relying on expert testimony, the plaintiffs further note that it is generally recognized among testing experts that the NTE have an adverse racial impact on black teachers. They also point to a long line of court decisions finding such impact.

On the other hand, the Mobile County defendants argue that a final determination of whether there is an adverse impact cannot be made without additional data, which is unavailable at this time—data from which the selection rates for black and white teachers in the school system can be compared. *See Uniform Guidelines on Employee Selection Procedure*, 29 C.F.R. §§ 1607–1607.18 (1982).[12] They

11. In B. Schlei and P. Grossman, *Employment Discrimination Law*, 2nd Edition (1983), test validation is described as follows:

There are three generally recognized methods of test validation: criterion-related validation, content validation, and construct validation. Criterion-related validation is established when there is a significant positive correlation between comparative success on the test and comparative success on some measure of job performance. The degree of this relationship is expressed by a "correlation coefficient," which ranges from −1.0 (completely negative relationship: the better one does on the test, the worse one performs on the job) to +1.0 (total identity of relative test scores and relative job performance).

There are two types of criterion-related validation: predictive and concurrent. In a predictive study, the sample group members take the test before they take the job and are selected without regard to their test scores. Their later job performance is evaluated and compared to their test scores to determine whether the test accurately predicted performance. By contrast, in a concurrent study the test is administered to incumbent employees, and their current job performance is evaluated against their test scores.

Content validation is established when the test itself closely approximates the tasks to be performed on the job. The classic example of a test having content validity is a typing test for a typist job position.

Construct validation is established when there is a significant relationship between the test and the identification of some trait, such as "intelligence" or "leadership," which is required in the performance of the job. As a practical matter, construct validity has to date been largely a theoretical concept, even among industrial psychologists, and has rarely arisen in litigated testing cases.

*Id.* at 114 (footnotes omitted).

12. In B. Schlei and P. Grossman, *Employment Discrimination Law*, 2nd Edition (1983), the Guidelines are described as follows:

For determining adverse impact, the Uniform Guidelines set 80 percent as a "rule of thumb." Thus, a scored test or other selection device normally is considered to have adverse impact under the Uniform Guidelines if it has a "selection rate for any race, sex, or ethnic group which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate * * *." This standard is invariably applied to selection rather than rejection rates.

   *      *      *      *      *      *

Eighty percent is merely a "rule of thumb": "Smaller differences in selection rate may nevertheless constitute adverse impact, where

further correctly point out that tests are not valid or invalid *per se*, but must be evaluated in the setting in which they are used; the fact that the validity of a particular test has been ruled upon in prior litigation is not necessarily determinative in a different factual setting. *United States v. Georgia Power Co.*, 474 F.2d 906, 912 (5th Cir.1973). They argue, therefore, that evidence, such as that testing experts have generally recognized the NTE as having an adverse impact on black teachers or that other courts have found NTE to have an adverse impact, is not conclusive evidence that the NTE have had an adverse impact in the Mobile County School System.

■ The Mobile County defendants overlook the significant fact that this cause is now before the court on a request for preliminary, not permanent, injunctive relief. On a request for preliminary injunctive relief the burden on a plaintiff is not to show with certainty that he or she will prevail on the merits, but to show that there is a substantial likelihood that he or she will prevail. *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Company*, 621 F.2d 683 (5th Cir. 1980); *Dallas Cowboy Cheerleaders*, 600 F.2d at 1188. On a request for preliminary injunctive relief a court, therefore, deals generally in a "calculus of probabilities." *Id.* With these principles in mind, the court must conclude that the plaintiffs have met their initial burden of establishing that there is a substantial likelihood that the trial evidence will reveal adverse racial impact. In view of the fact that the Mobile County School System is 36–39% black but 66–67% of those denied reemployment because of the test requirement were

black, and in view of the NTE's unvarying history of adverse racial impact, the conclusion is inescapable that when all the evidence is in, adverse racial impact will probably be found.

■ This conclusion is further reinforced by the following additional evidence. The court recognizes that the Mobile County Board of School Commissioners is under no legal obligation to validate its use of the NTE in selection of teachers, unless there is evidence of adverse racial impact. The court also recognizes that the school board is under no legal obligation to investigate whether adverse racial impact is present. Nevertheless, the NTE guidelines, issued by the Testing Service, reflect an acute sensitivity to the fact that its examinations are easily subject to misuse, in particular against black teachers. The guidelines, therefore, "discourage" use of arbitrary cutoff scores, and provide that if cutoff scores are used it is essential to have prior knowledge of the probable consequences. Nevertheless, the Mobile County School Board implemented use of an NTE cut-off score as a selection procedure without a prior investigation into the probable consequences.[13] In view of the Mobile County Board of School Commissioners' apparent misuse of the NTE, the court is of the opinion that there is an increased likelihood that the school board is misusing the exams in a manner adversely affecting black teachers in the school system.

Finally, since at this time there is no evidence of validation of the test requirement, the court must further conclude that there is a substantial likelihood that the plaintiffs will prevail in this case.[14]

they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex or ethnic group." 29 CFR § 1607.4(D) (1981). On the other hand, selection ratios that do not meet the 80% rule may nevertheless not constitute adverse impact if they are the product of small numbers and lack statistical significance, or if special recruiting has caused the "pool of minority or female candidates to be atypical of the normal pool of applicants from that group." *Id.*

*Id.* at 94 (footnotes omitted) & n. 42.

**13.** The plaintiffs have characterized the Mobile County defendants' procedure for selecting their cutoff score as a "homemade methodology." The evidence, so far, supports this characterization.

**14.** Since the NTE test requirement may not be used for black applicants and teachers, it follows that it may not be used for white ones either.

### 2. Irreparable Injury

■ Since the plaintiffs seek preliminary injunctive relief pursuant to Title VII, they are not required to make the usual showing of irreparable harm as a prerequisite to relief. In *Middleton-Keirn v. Stone*, 655 F.2d 609, 611 (5th Cir.1981) (Unit B), the appellate court stated:

> The Fifth Circuit has ruled that irreparable injury will be presumed in the case of private sector employees seeking a preliminary injunction in Title VII employment discrimination actions.

> \* \* \* \* \* \*

> "Where ... the statutory rights of employees are involved and an injunction is authorized by statute and the statutory conditions are satisfied ... the usual prerequisite of irreparable injury need not be established and the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury before obtaining an injunction.... We take the position that in such a case, irreparable injury should be presumed from the very fact the statute has been violated. Whenever a qualified ... employee is discriminatorily denied a chance to fill a position for which he is qualified and has the seniority to obtain, he suffers irreparable injury and so does the labor force of the country as a whole."

655 F.2d at 611 (*quoting United States v. Hayes International Corp.*, 415 F.2d 1038, 1045 (5th Cir.1969)).

Notwithstanding the above, the plaintiffs have demonstrated irreparable injury. For, they will be removed from their professional environment and will be unable to advance their careers.

### 3. Relative Threatened Harm

■ Requiring that the school board defendants reinstate the plaintiffs would not saddle the school system with incompetent teachers. To the contrary, the school system administrators have personally ob-served the plaintiff teachers and have found them, but for their NTE scores, to be competent and worthy of reemployment. Furthermore, preliminarily enjoining the Mobile County defendants from using the test requirement poses no substantial harm to them. The school system may simply continue to use other reliable methods, used in the past, to employ and reemploy teachers. On the other hand, as already indicated, the plaintiff teachers would suffer irreparable injury if they are denied reinstatement pending final determination of this cause.

### 4. Public Interest

■ In *Griggs v. Duke Power Co., supra,* the Supreme Court recognized the strong national mandate for "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." 401 U.S. at 431, 91 S.Ct. at 853. In cases, such as the instant one, where evidence of the possible presence of such a barrier is strong, it would be a disservice to the public interest to deny preliminary injunctive relief.

### III. CONCLUSION

In conclusion, the plaintiffs are, for the above reasons, entitled to appropriate preliminary injunctive relief, which, as is apparent, merely maintains the *status quo*, as it existed prior to implementation of the test requirement, until such time as this court or another court[15] has been able to provide the required plenary review of what is clearly a serious challenge to the requirement.

---

15. The court has under submission the Mobile County defendants' June 24, 1983, motion for

change of venue, etc.