Arnetta YORK, Alma D. Willis, Herbert White, Gwendolyn Webb, Helen Taylor, Barbara J. Taylor, Valeria B. Oakley, Charlie Nichols, Portia M. Lockette, Robert Likely, Ernestine Kinslow, Angela King, Paula A. Hickman, Angela M. Gordon, Salle Ann Glover, Deborah A. Flakes, Cloteal Feurtado, Palmer Deloris Curry, Augusta F. Crosby, Alfreda Bolden, Joyce R. Black, Brigitte Bartell and Ricky L. Allen, individually and on behalf of a class of similarly situated persons, Plaintiffs,

v.

ALABAMA STATE BOARD OF EDUCATION; John Tyson, Isabelle Thomasson, S.A. Cherry, John Fulmer, Victor Poole, Harold C. Martin, James B. Allen, Jr., and Evelyn Pratt, individually and in their official capacities as members of the Alabama State Board of Education; Wayne Teague, individually and in his capacity as State Superintendent of Education; Board of School Commissioners of Mobile County, Alabama, Abe L. Hammons, Dan C. Alexander, Jr., Norman J. Berger and Ruth F. Drago, Defendants.

Civ. A. No. 83–T–421–N.

United States District Court,
M.D. Alabama, N.D.

Feb. 26, 1986.

James U. Blacksher, Gregory B. Stein, Blacksher, Menefee & Stein, Mobile, Ala., Donald Watkins, Watkins Carter & Knight, Montgomery, Ala., for plaintiffs.

Major Madison, Jr., Mobile, Ala., for member of class Emlyn Wilson.

Jon A. Green and Robert Campbell, Sintz, Pike, Campbell & Duke, Mobile, Ala., for Bd. of School Com'rs of Mobile Co.; Hammons, Alexander, Berger and Drago.

Charles S. Coody and Jeffery A. Foshee, State Bd. of Educ., Robert E. Sasser, Jones, Murray, Stewart & Yarbrough, T.W. Thagard, Jr., David R. Boyd, Montgomery, Ala., for State Defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

This lawsuit challenged the adoption and use of the National Teacher Examinations (NTE) in the Mobile County School System. It is now before the court on the plaintiffs' September 9, 1985, motion for attorney fees and expenses. Based on the evidence and briefs submitted by the parties, the court concludes that the plaintiffs are entitled to attorney fees and expenses in the amount of $227,880.14

## I. BACKGROUND

In May 1983, several teachers brought this lawsuit under the 14th amendment to the U.S. Constitution and several federal statutes, including 42 U.S.C.A. §§ 2000d, 2000e through 2000e–17 (otherwise known as Title VI and Title VII of the Civil Rights Act of 1964), and 42 U.S.C.A. §§ 1981, 1983, 1988. They sued the Alabama State Board of Education and its members and superintendent (the "state defendants") and the Board of School Commissioners of Mobile County, Alabama and its members (the "Mobile defendants"). They charged that the Mobile defendants' adoption and use of the NTE to deny employment to prospective and already employed teachers

in the Mobile County School System discriminated against black persons. .

On August 10, 1983, the court certified a plaintiff class consisting of all "applicants for teaching positions and nontenured teachers who have been in the past, or may be in the future, denied employment or reemployment in the Mobile County School System because of the school system's NTE test requirement." *York v. Alabama State Board of Education*, 581 F.Supp. 779, 780 n. 2 (M.D.Ala.1983). On that date, the court also preliminarily found that the test requirement had an impermissible adverse racial impact against black teachers in violation of Title VII, and the court granted "preliminary injunctive relief (1) prohibiting the Mobile County defendants from using the test requirement and (2) requiring that said defendants reemploy nontenured teachers ... who but for their failure to meet the test requirement would have been reemployed." *Id.* at 781.

The Mobile defendants appealed and sought an immediate stay of this court's preliminary injunction. This court and the Eleventh Circuit Court of Appeals denied the stay requests, and the Mobile defendants dismissed their appeal.

The Mobile defendants then proceeded to ignore the court's preliminary injunction. On September 9, 1983, the plaintiffs filed a motion for civil contempt, and shortly thereafter the court entered an order allowing the Mobile defendants until September 14 to comply with the court's injunction. The Mobile County School Board then sought to evade the court's order by rehiring class member teachers as "floating" teachers only and by refusing to reassign them to their normal classes. On September 14, the plaintiffs filed a second motion for civil contempt, and the court ordered the members of the school board to appear personally before the court on September 20 to show cause why they should not be held in contempt of court. On September 19, the school board substantially complied with the injunction and the court denied the civil contempt motions without prejudice. Further proceedings were then required to

determine whether certain teachers fell within the scope of the preliminary injunction and to resolve disputes about the appropriate pay rates for those reemployed and the dates from which they were to be paid.

The plaintiffs proceeded with discovery and trial preparation, focusing their efforts on three principal areas. First, plaintiffs' counsel sought to establish that the Mobile defendants' use of the NTE requirement adversely affected black teachers. They propounded interrogatories designed to solicit the numbers and percentages of black and white teachers who were terminated or not hired because of their NTE scores. The Mobile defendants responded by making a tender of documents pursuant to Fed. R.Civ.P. 33(c). This response required that plaintiffs' counsel hire paralegals who spent months at the Mobile defendants' offices extracting data from employment records. This raw data was entered into a computer and analyzed by an expert. Second, plaintiffs' counsel sought to establish that the Mobile defendants had not properly "validated" the NTE for use in their school system. They retained and prepared two expert witnesses who analyzed the teacher examinations and scrutinized the Mobile defendants' recently completed validation study of their NTE requirement. Each of the plaintiffs' experts was fully prepared for trial, and one was deposed. Third and finally, plaintiffs' counsel sought to show that the Mobile defendants' use of the tests was irrational and arbitrary. They consulted informally with NTE personnel to establish that the Mobile defendants had improperly utilized the tests.

The plaintiffs and the Mobile defendants reached a settlement on May 3, 1985, six days before the trial date. At that time, plaintiffs' trial preparation was substantially complete. The court later approved the settlement for the plaintiff class pursuant to Fed.R.Civ.P. 23(e).

The settlement is in the form of a consent decree and provides a wide range of relief to the plaintiff class. Most significantly, the decree enjoins the Mobile de-

fendants from ever again using the NTE in the hiring, reemployment or promotion of teachers and from using any other written examination for those purposes if the exam has an adverse racial impact and has not been properly validated.

The decree also provides for immediate and particular relief to different categories of class members. First, the decree provides that class members reemployed under the preliminary injunction are to have their tenure rights and salaries adjusted as if they had been continuously employed by the Mobile County School System. Second, the decree provides that class members who declined employment under the preliminary injunction or who could not be located in time to take advantage of the injunction are to be offered reemployment once more, for the 1985–86 school year. These teachers are to be granted tenure and receive salaries on the basis of all their years with the Mobile County School System, including the year or years they missed because of the NTE requirement. Third, the decree provides that class members who were reemployed under the preliminary injunction but whose employment was subsequently nonrenewed or terminated are not guaranteed reemployment. However, their employment records are to be purged to remove any adverse materials and the Mobile defendants are required to give them a neutral recommendation for reemployment.

Fourth, the decree requires that the Mobile defendants accord a "special application process" to class members who, during the relevant years, applied unsuccessfully for employment and did not present a sufficient NTE score and whose employment records did not reflect some other, definite reason for their failure to be employed. The decree requires that the county school board give notice to these class members inviting them to reapply; afford these candidates fair and equitable consideration; report to the court and to the plaintiffs' counsel the reason for not hiring any such person; and provide the court and the plaintiffs' counsel with information sufficient to determine the hiring rates of these

class members and the hiring rate generally.

The decree also requires that the Mobile defendants pay the sum of $635,000 to be distributed as follows. Each of the named plaintiffs will receive a total of $1,000 for acting as class representatives and prosecuting the lawsuit as a class action. The remaining amount will be distributed on an equal basis to all teachers who meet the following conditions: (a) at the end of the 1979–80, 1980–81, and/or 1981–82 school year, they were recommended by their principals for contract renewal; (b) they had not at that time presented to the school board a score of 500 or greater on the commons portion of the NTE; and, (c) they were not reemployed the subsequent school year despite their principals' recommendations.

The Mobile defendants also agreed to pay the plaintiffs their reasonable costs and attorney fees.

After settling with the Mobile defendants, the plaintiffs negotiated and the court approved a settlement with the state defendants in the form of an offer and acceptance of judgment pursuant to Fed.R. Civ.P. 68. This settlement provides credit toward state teaching certificates for class members who lacked necessary teaching experience for such certificates because they were denied employment or reemployment by the Mobile defendants on the basis of the school system's NTE requirement.

## II. ATTORNEY FEES AGAINST MOBILE DEFENDANTS

The Civil Rights Attorney's Fees Awards Act, 42 U.S.C.A. § 1988, and the attorney fee provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–5(k), authorize courts to award reasonable attorney fees to prevailing civil rights litigants.

 The plaintiffs are prevailing litigants against the Mobile defendants. It is well settled that "a party may be considered to be 'prevailing' if the litigation successfully terminates by a consent de-

cree, an out of court settlement ... or other mooting of the case when the plaintiff has vindicated his right." *Martin v. Heckler*, 773 F.2d 1145, 1149 (11th Cir. 1985) (en banc), *quoting Doe v. Busbee*, 684 F.2d 1375, 1379 (11th Cir.1982). Here, the plaintiffs have plainly vindicated their rights with the consent decree adopted by this court.

Moreover, the consent decree itself expressly provides that the plaintiffs are to recover attorney fees from the Mobile defendants.

Therefore, given that the plaintiffs are entitled to attorney fees from the Mobile defendants, the only task for the court is to determine a reasonable award. In so doing, the court is guided by the following 12 factors set out in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir.1974): (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and the ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the clients; and (12) awards in similar cases. The court is also guided by the recent Supreme Court decisions of *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) and *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

The court begins with the Supreme Court's observation in *Blum* and *Hensley* that the number of hours reasonably expended to prosecute the lawsuit and the prevailing market rate provide an important starting point for any fee determination. *Blum*, 465 U.S. at 897 & n. 14, 104

S.Ct. at 1548 & n. 14; *Hensley*, 461 U.S. at 432, 103 S.Ct. at 1939. In making its fee award, the court will therefore start by determining: (a) the number of hours reasonably devoted to this litigation; and (b) the prevailing market rate for non-contingent work performed by similarly situated attorneys in similar cases in the community. The product of these two figures will provide the court with a "lodestar" figure. The court will then determine whether, based on additional factors, any portion of this lodestar fee should be adjusted upwards or downwards. Such an approach has been approved in *Jones v. Central Soya Co., Inc.*, 748 F.2d 586, 589 & n. 3 (11th Cir.1984).

### A. *Reasonable Hours*

The time and labor required to prosecute an action are a "necessary ingredient" to any fee award. *Johnson*, 488 F.2d at 717. The court will therefore determine which hours were reasonably necessary in this case and compensate plaintiffs' attorneys only for those hours.

The plaintiffs were principally represented by Gregory Stein, James Blacksher, and Wanda Cochran of the law firm Blacksher, Menefee & Stein of Mobile, Alabama. Donald Watkins of the law firm Watkins, Carter & Knight of Montgomery, Alabama served as local counsel for the plaintiffs. Stein, who served as lead counsel, claims 946.35 hours; Blacksher claims 235.5 hours; Cochran claims 56.2 hours; and Watkins claims 10 hours. These figures, some of which vary slightly from those originally claimed, reflect corrections for mathematical errors.

The court has considered two *Johnson* factors—the novelty and difficulty of the case and the amount involved and the result obtained—in assessing the reasonableness of the hours claimed.[1] This case was not novel. This case was, however, a difficult Title VII disparate impact case, requiring, as demonstrated below, a sophisticated understanding and presentation of complex

---

1. The initial calculation of reasonable hours at the prevailing market rate will often subsume many of the other *Johnson* factors. *Blum*, 465

U.S. at 896–900, 104 S.Ct. at 1548–49; *Hensley*, 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9.

principles of law and a substantial amount of evidence. In addition, plaintiffs' counsel obtained not only substantial benefits, both monetary and nonmonetary, for their clients, but also rendered a substantial and significant service to all the people of the Mobile area by securing the elimination from their midst of another apparent obstacle to the fair and nondiscriminatory consideration of persons for employment in the Mobile County School System. In general, the hours claimed reasonably reflect the difficulty of this case and the efforts and success of the plaintiffs' counsel.

■ The Mobile defendants have, however, presented several challenges to the claimed hours, each of which, with two minor exceptions, lacks merit. First, they argue that the court should disallow all of Blacksher's hours because his time sheets are not supported by a sworn affidavit. The evidence establishes, however, that the claimed hours are an accurate transcription of Blacksher's contemporaneous entries. Moreover, his claimed time is supported by his deposition testimony taken under oath.

Second, the Mobile defendants contend that the descriptions of how each attorney's time was spent are not specific enough for the court to assess whether the time spent was reasonable for the prosecution of this lawsuit. To the contrary, the time sheets are highly detailed and meet the required level of specificity.

■ Third, the defendants argue that the court should disallow all time spent on the claims of class members who were ultimately found not to be entitled to relief under the consent decree. However, the work relating to those claims was so intertwined, both factually and legally, with the successful claims that the challenged hours must be deemed compensable. *Carmichel v. Birmingham Saw Works,* 738 F.2d 1126, 1137 (11th Cir.1984) (court should not disallow hours that were related and necessary to the successful claims).

Finally, the court would mention two additional factors contributing to its conclusion that the claimed hours are reasonable.

Testimony regarding exercise of "billing judgment" indicates that counsel has not claimed all hours spent on this litigation, and that an effort was made to bill only reasonable hours. Nor has this court observed any unnecessary duplication of effort among the four attorneys representing the plaintiffs and plaintiff class in this litigation. It is customary for lawsuits such as this to involve multiple staffing, and each of the four attorneys made a distinct contribution. *Jones v. Central Soya Co., Inc.,* 748 F.2d at 594.

■ While the court finds that the claimed hours are generally reasonable and compensable, it does agree with the Mobile defendants to the extent that Stein should not be permitted .2 hours he spent speaking with the author of a student law review note about teacher testing cases, and Blacksher should not recover for 10.7 hours he spent exclusively in a related state proceeding. Accordingly, the court will reduce Stein's claimed time from 946.-35 to 946.15 hours and Blacksher's time from 235.5 to 224.8 hours. Each of the other specific challenges to claimed hours raised by the defendants at the evidentiary hearing is rejected as meritless and not warranting discussion.

The court therefore finds the following hours to be reasonable and compensable:

| | |
|---|---|
| Stein | 946.15 hours |
| Blacksher | 224.80 hours |
| Cochran | 56.20 hours |
| Watkins | 10.00 hours |

### B. *Prevailing Market Rate*

■ The court will next determine the prevailing market rate. In so doing, the court will consider the following *Johnson* factors: customary fee; skill required to perform the legal services properly; the experience, reputation and ability of the attorneys; time limitations; preclusion of other employment; undesirability of the case; nature and length of professional relationship with the clients; and awards in similar cases.

Customary Fee. The plaintiffs contend that the customary fee for attorneys of similar experience in the community supports an hourly non-contingent fee of $120 for Stein, Blacksher, and Watkins, and an hourly fee of $75 for Cochran. The evidence of record indicates that in the Mobile-Montgomery area an attorney with approximately the same experience as Stein, Blacksher, and Watkins charges a non-contingent fee ranging between $85 and $125 an hour and that an attorney with about the same experience as Cochran charges between $50 and $80 an hour.

Skill Required to Perform the Legal Services Properly. The work product of plaintiffs' attorneys demonstrates a high degree of skill in complex civil rights litigation.

Experience, Reputation, and Ability of the Attorneys. Blacksher has been practicing since 1971, Watkins since 1973, and Stein since 1975. Each enjoys a well-deserved reputation for civil rights advocacy of the highest order. Cochran, while in her first year of practice, has exhibited such a degree of skill and ability that her market rate should be set on the high end of the range mentioned for someone of her experience.

Time Limitations. This factor requires "some premium" where there has been "[p]riority work that delays the lawyer's other legal work." *Johnson*, 488 F.2d at 718. "This factor is particularly important when new counsel is called in to prosecute the appeal or handle other matters at a late state in the proceedings." *Id.* There is no evidence of such limitations here.

Preclusion of Other Employment. This factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson*, 488 F.2d at 718. There is no significant evidence of such preclusion here.

Undesirability of the Case. In *Foster v. Board of School Commissioners of Mobile County, Alabama*, No. 80 460–H–S (S.D. Ala. Oct. 23, 1985) (recommendation of magistrate adopted by court), United States Magistrate Patrick H. Sims recently remarked that representing civil rights plaintiffs remains very undesirable in Mobile, Alabama. He stated:

It remains true in this District that representation of plaintiffs in a case of this nature is undesirable for several reasons. First, counsel who succeed frequently in cases of this type are identified as "civil rights lawyers." This identity can be beneficial in that it attracts other similar claims. However, that identity also tends to be a stigma in terms of attracting other sophisticated federal practice. The evidence establishes that, while a lawyer who does antitrust plaintiff's work is readily hired to defend a securities case or defend a Title VII case, successful plaintiffs' civil rights lawyers are not hired for other types of sophisticated federal litigation. Second, and related to the first, representation of plaintiffs in cases such as this tends to be a "high profile" position with substantial press coverage and public discussion. The evidence establishes that most entities which hire lawyers for sophisticated federal practice avoid all possibility of publicity.

The evidence here fully supports these observations by Magistrate Sims. Indeed, the evidence here further reflects that this lawsuit and the plaintiffs' attorneys themselves were subjected to substantial, and often vitriolic, public criticism in the Mobile area.

Nature and Length of Relationship with Clients. The plaintiffs and many members of the plaintiff class belong to the Alabama Education Association, with whom Blacksher, Stein, and Watkins maintain a long-standing professional relationship.

Awards in Similar Cases. The court has been informed that Blacksher recently received a market rate of $115 per hour and Stein a rate of $95 per hour in a voting rights case.

Based on these criteria, the court is of the opinion that the following hourly fees for plaintiffs' counsel reasonably reflect the prevailing market rate for non-contingent work performed by similarly situated attorneys in similar civil rights cases:

| | |
|---|---|
| Stein | $ 95/hour |
| Blacksher | 115/hour |
| Cochran | 75/hour |
| Watkins | 105/hour |

In setting these hourly rates, the court has compensated for delay in payment by "apply[ing] to the award a figure which is recognized as representing the time value of money over the period of the litigation." *Gaines v. Dougherty County Board of Education*, 775 F.2d 1565, 1572 n. 14 (11th Cir.1985) (per curiam).

## C. *Lodestar Calculation*

The court will now calculate an unadjusted lodestar figure for each attorney consisting of the product of the attorneys' compensable time and his or her prevailing market fee.

| ATTORNEY | HOURS | RATE | TOTAL |
|---|---|---|---|
| Stein | 946.15 | $ 95 | $89,884.25 |
| Blacksher | 224.80 | 115 | 25,852.00 |
| Cochran | 56.20 | 75 | 4,215.00 |
| Watkins | 10.00 | 105 | 1,050.00 |

## D. *Adjustment*

Plaintiffs' attorneys seek a 100% upward adjustment of the lodestar figures. For the reasons stated below, the court is of the opinion that the contingencies present in this case warrant a smaller, 50% adjustment for hours claimed before settlement, and no upward adjustment for the remaining hours.

Although the Supreme Court has deferred ruling on whether "the risk of not being a prevailing party ... and therefore not being entitled to attorney's fees from one's adversary, may ever justify an upward fee adjustment," *Blum* 465 U.S. at 901, 104 S.Ct. at 1550 n. 17, "[i]t is well established in [the Eleventh Circuit] ... that a contingency fee arrangement may justify an increase in an award of attorney's fees." *Jones v. Central Soya Co., Inc.*, 748 F.2d at 591; *see also Blum*, 465 U.S. at 900, 104 S.Ct. at 1550 (Brennan, J., concurring) ("Congress has clearly indicated that the risk of not prevailing ... is a proper basis on which a district court may award an upward adjustment to an otherwise compensatory fee"). The purpose of an upward adjustment based on contingency is to place civil rights attorneys in the same position as other attorneys who charge a higher rate when payment is contingent upon success. "Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result." *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir.1981) (en banc). This "risk premium" is "intended to encourage competent counsel to take on possibly undesirable cases by providing for adequate compensation for their successful efforts." *Jones v. Central Soya Co., Inc.*, 748 F.2d at 593. Judge Vance summarized these policy considerations in *Yates v. Mobile County Personnel Board*, 719 F.2d 1530, 1534 (11th Cir.1983):

Vindication of the policy of the law depends to a significant degree on the willingness of highly skilled attorneys, such as those now before the court, to accept employment in discrimination cases on a wholly contingent basis. They will hardly be willing to do so if their potential compensation is limited to the hourly rate to which they would be entitled in noncontingent employment. Busy and successful attorneys simply could not afford to accept contingent employment if those were not the rules that were ap-

plied. The enforcement of our civil rights acts would then be entrusted largely to less capable and less successful lawyers who lack sufficient employment. Such an arrangement would ill serve policies of enormous national importance.

The Eleventh Circuit has, however, "specifically rejected the contention that there must be enhancement in every case in which a fee is contingent." *Id.* Nonetheless, the upward adjustment for contingency should be the norm rather than the exception. "When the attorney fee is contingent upon success, the hourly rate should ordinarily be raised to compensate the attorney for the risk of nonrecovery." *Carmichel,* 738 F.2d at 1138. The court will now discuss those factors that should guide a court in determining when and to what extent an upward adjustment is appropriate.

■ For a case to be considered contingent, a plaintiff's counsel must have actually agreed not to hold his client accountable for his fees if he loses the case. *Jones v. Central Soya Co., Inc.,* 748 F.2d at 593. The "practical risk" of nonrecovery from indigent clients is not enough. *Id.* Here the evidence establishes that an actual contingency agreement was reached between the plaintiffs and their counsel.

The Mobile defendants argue that the fee arrangement was not truly contingent because the Alabama Education Association payed plaintiffs' counsel's out-of-pocket expenses on the understanding that such funds would be reimbursed should the plaintiffs prevail. These advances totalled $52,247.01. This contention is meritless. It is firmly established in this circuit that partial compensation by third parties does not compel denial of a contingency enhancement or reduction of an attorney fees award. *See, e.g., Johnson v. University College of the University of Alabama in Birmingham,* 706 F.2d 1205, 1210 (11th Cir.), *cert. denied,* 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 644 (1983).

■ However, the court still cannot presume risk from the mere existence of a bona fide contingency agreement. The court must determine whether and to what extent the legal and factual difficulties of the particular case before it warrant addition of a "risk premium" to the lodestar figure. *See generally Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 613 (1st Cir. 1985) (actual risks borne by attorneys should determine whether an upward adjustment is called for, not the mere fact that the case was taken on a contingent basis). *See also Blum,* 465 U.S. at 902, 104 S.Ct. at 1551 (Brennan, J., concurring) ("Congress authorized district courts to award upward adjustments to compensate for the contingent nature of success, and thus for the risk of nonpayment in a particular case"); A. Miller, *Attorney's Fees in Class Actions* at 373–374 (Federal Judicial Center 1980) (contingency consideration should be limited to the risks involved in each particular case). This rule furthers Congressional intent by ensuring that attorney fee awards, while attracting competent counsel, do not create huge windfalls for civil rights attorneys. *Duncan v. Polythress,* 777 F.2d 1508, 1513 nn. 15 & 16 (11th Cir.1985).

In determining whether the risk present in a particular case warrants an upward adjustment in the lodestar, the court must begin by ascertaining "the unlikelihood of success and the risk of nonpayment for counsel, 'viewed at the time of filing suit.'" *Hall v. Borough of Roselle,* 747 F.2d 838, 843 (3d Cir.1984), *quoting Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 117 (3d Cir.1976). When, "from the very outset, liability of the defendants was clear and the case involved no novel legal theory or difficult factual questions," an upward adjustment for contingency may be denied. *Hall,* 747 F.2d at 843. When, however, the legal theories advanced are so novel and the factual hurdles presented so substantial that the prevailing party's risk of loss at the time suit was filed was quite high, an upward adjustment of 100% or more for contingency may be appropriate. Of

course, when the novelty and difficulty of the case at the time it was filed falls somewhere between the two extremes outlined above, the court will consider the degree of risk and award an upward adjustment that reflects this risk.

■ Here, the degree of risk at the time this lawsuit was filed fell between the two extremes outlined above. The case was neither fraught with risk nor a sure winner. Although the court concluded in its August 10, 1983, memorandum opinion awarding preliminary injunctive relief that there was a substantial likelihood plaintiffs would prevail on their Title VII claim, *York*, 581 F.Supp. at 784–86, this likelihood of success was counterbalanced by significant contingencies.[2]

The court described Title VII disparate impact law as follows in its August 10, 1983, memorandum opinion:

> In a Title VII disparate impact case, such as the instant one, a plaintiff challenges "practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The plaintiff, therefore, need not prove intentional discrimination. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The proper allocation of burdens is well established. The plaintiff has the initial burden of establishing a prima facie case of racial discrimination, which he or she may do merely by showing that the facially neutral tests in question have an adverse racial impact. *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854. Tests are considered as having an adverse racial impact if they "select applicants for hire or promotion at a racial pattern significantly different from the pool of applicants." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). If the plaintiff establishes a prima facie case, the burden then shifts

to the defendant to show that the tests have "a manifest relationship to the employment in question," *Griggs, supra* —that is, have been validated. If the defendant carries its burden, the plaintiff may nevertheless prevail if he or she can show "that other selection devices without a similarly undesirable racial effect would also serve the employer's legitimate interest." *Albemarle Paper Co., supra.*

*York*, 581 F.Supp. at 784–85 (footnote omitted).

The court based its preliminary injunction on the following information: partial data tending to demonstrate adverse impact against black teachers and job applicants in the Mobile County School System; testimony by Alabama's Assistant Superintendent of Education indicating that the NTE examinations are known to have an adverse impact against black teachers; decisions by other courts holding, in varying contexts, that the NTE tests adversely affect black teachers; policy statements by the authors of the NTE examinations discouraging use of arbitrary cutoff scores without prior investigation of the probable consequences; and the Mobile defendants' failure to present any evidence of validation.

While this evidence led the court to conclude that there was a substantial likelihood that the plaintiffs would establish a prima facie case and the defendants would be unable to rebut this case, several significant contingencies remained. It is well known that proof of adverse impact in testing cases involves many complex legal, scientific, psychological, and factual questions. *See generally* B. Schlei & P. Grossman, *Employment Discrimination Law* at 80–161 (2d ed. 1983). For purposes of brevity, the court will focus only on the significant risks faced by the plaintiffs here.

The plaintiffs' initial burden at trial would have been to demonstrate a statisti-

---

**2.** The plaintiffs advanced several other theories or claims. The court has, however, focused solely on the plaintiffs' Title VII claim because it

is apparent that this claim was their strongest, least risky claim.

cally significant difference between the tests' impact on black and white teachers. Such a showing was subject to challenge on several fronts. First, the defendants could have attacked the method of comparison utilized in plaintiffs' statistical study. The court would then have been required to determine whether pass rates, selection rates, or failure rates should have been the appropriate unit of analysis. A ruling adverse to the plaintiffs on this point alone could have destroyed the prima facie evidence and compelled judgment for the defendants. Second, the defendants could have attacked the reliability of plaintiffs' underlying data, asserting that the sample size was too small or that the data was incomplete or inaccurate. Again, an adverse determination on this point could have warranted judgment for the defendants.

Even if the plaintiffs passed these initial hurdles, the defendants might have prevailed if they validated the tests by establishing "a demonstrable relationship" between the tests and the job in question. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The record reflects that the Mobile defendants had completed a validation study to be used at trial. Furthermore, while a showing of test validity must be "situationally specific," *United States v. Georgia Power*, 474 F.2d 906, 912 (5th Cir. 1973), it is noteworthy that one court has found the NTE tests properly validated for use by a state to certify teachers and determine their pay. *United States v. State of South Carolina*, 445 F.Supp. 1094, 1112 (D.S.C.1977), *aff'd*, 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978).

The contingencies detailed above warrant an upward adjustment in the lodestar. However, virtually all contingencies ceased on the day the parties settled this case. The settlement was clearly an excellent resolution of this lawsuit, and the parties should have been reasonably confident of approval by the court. No upward adjustment is warranted for time claimed after this date. Accordingly, the court will divide the lodestar into non-contingent and contingent components, and award an upward adjustment only for the contingent portion.

Using the date of settlement, May 23, 1985, as the first non-contingent date, the court finds that the non-contingent portion of the lodestar for each attorney is as follows:

| ATTORNEY | HOURS | RATE | TOTAL |
|----------|-------|------|-------|
| Stein | 112.50 | $ 95 | $10,687.50 |
| Blacksher | None | — | — |
| Cochran | 14 | 75 | 1,050.00 |
| Watkins | None | — | — |

As to the contingent portion of each attorney's lodestar, the court is of the opinion that an upward adjustment of 50% is warranted. The court bases this conclusion on the significant contingencies that existed from the time the lawsuit was filed, and on the conviction that these contingencies, while significant, were not of such a magnitude that the claimed 100% multiplier would be appropriate. The contingent portion of the lodestar for each attorney, then, is as follows:

| ATTORNEY | HOURS | RATE | SUB-TOTAL | 50% ADJUSTMENT | TOTAL |
|----------|-------|------|-----------|----------------|-------|
| Stein | 833.65 | $ 95 | $79,196.75 | $39,598.38 | $118,795.13 |
| Blacksher | 224.80 | 115 | 25,852.00 | 12,926.00 | 38,778.00 |
| Cochran | 42.20 | 75 | 3,165.00 | 1,582.50 | 4,747.50 |
| Watkins | 10.00 | 105 | 1,050.00 | 525.00 | 1,575.00 |

Adding the non-contingent and contingent figures together, the court awards the following fees to each attorney:

| ATTORNEY | NON-CONTINGENT AWARD | CONTINGENT AWARD | TOTAL AWARD |
|----------|----------------------|------------------|-------------|
| Stein | $10,687.50 | $118,795.13 | $129,482.63 |
| Blacksher | None | 38,778.00 | 38,778.00 |
| Cochran | 1,050.00 | 4,747.50 | 5,797.50 |
| Watkins | None | 1,575.00 | 1,575.00 |
| Total | | | $175,633.13 |

## III. EXPENSES AGAINST MOBILE DEFENDANTS

■■■ Plaintiffs' counsel also petition this court for an award of expenses totalling $52,247.01. The Mobile defendants object on the grounds that the claimed expenses are unreasonable. In particular, they argue that substantial sums relating to time spent by experts and paralegals should be denied. The court concludes that these arguments are meritless. The experts' time was well within the bounds of reason, especially since expert testimony was critical to the questions of disparate impact, test design and validation. As to the argument about paralegals, there is ample evidence that the extent of paralegal hours was due, at least in part, to the Mobile defendants' Rule 33(c) tender of documents. In any event, use of paralegals substantially reduced the number of claimed attorney hours. Accordingly, the court concludes that the claimed expenses are reasonable and fully compensable. *Dowdell v. City of Apopka, Florida,* 698 F.2d 1181, 1190–1191 (11th Cir.1983).

## IV. ATTORNEY FEES AND EXPENSES AGAINST THE STATE DEFENDANTS

The plaintiffs and the Mobile defendants contend that the state defendants should also be liable for the attorney fees and expenses in this litigation. The court disagrees.

■■■ The law in this circuit is that liability for attorney fees and expenses should be allocated according to the degree of responsibility attributable to each defendant. *Dean v. Gladney,* 621 F.2d 1331, 1339–40 (5th Cir.1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1521, 67 L.Ed.2d 819 (1981). Here, it is undisputed that the Mobile defendants decided to use the NTE despite the state defendants' warnings to the contrary. The Mobile defendants were, therefore, the beginning and end of the apparent problem. The state defendants are not culpable.

Admittedly, the plaintiffs obtained some relief from the state defendants. This relief was a settlement that provided for credit toward state teaching certificates for class members who lacked necessary teaching experience for such certificates because the Mobile defendants denied them employment and reemployment on the basis of the NTE requirement. The settlement with the state defendants was but necessary additional relief for the apparent wrong caused by the Mobile defendants. The Mobile defendants' conduct was therefore the basis for the attorney fees and expenses

incurred by the plaintiffs in obtaining supplemental relief from the state defendants.

Under these circumstances, the Mobile defendants should pay for all attorney fees and expenses in this litigation, including the fees and expenses incurred by the plaintiffs in obtaining additional relief from the state defendants. The state defendants should not be liable for any fees and expenses.

An appropriate order will therefore be entered requiring that the Mobile defendants pay the plaintiffs $227,880.14 for attorney fees and expenses.